**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK PRUDEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LEMONADE, INC., LEMONADE INSURANCE COMPANY, LEMONADE INSURANCE AGENCY, LLC, LEMONADE LTD. and LEMONADE LIFE INSURANCE AGENCY, LLC,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Mark Pruden ("Plaintiff"), on behalf of himself and all others similarly situated, brings this Class Action Complaint (the "Complaint") against Defendants Lemonade, Inc. and certain of its wholly owned subsidiaries, including Lemonade Insurance Company; Lemonade Insurance Agency, LLC; Lemonade Ltd.; and Lemonade Life Insurance Agency, LLC (collectively referred to as "Lemonade" or "Defendants"). Plaintiff alleges as follows based upon personal knowledge as to himself and this own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his counsel.

## I.      INTRODUCTION

1.      This action arises from Lemonade's unlawful collection, storage, analysis, and use of Plaintiff's and Class members' biometric data (as defined below) without their authorization or knowledge, and despite Lemonade's express representations to the contrary, from approximately June 2015 to the present (the "Class Period") in violation of statutory and common law of the State of New York, including New York's Uniform Deceptive Trade Practices Act, GBL § 349, *et seq.*, breach of express and implied contract, unjust enrichment, and declaratory judgment.

2.     Lemonade is an insurance company that offers renters, homeowners, pet, life insurance, and other related insurance policies and claim settlements. Lemonade distinguishes itself from other insurance carriers by conducting its operations digitally, leveraging artificial intelligence ("AI") based technology. Lemonade's business model utilizes online chatbots for most of insurance-related tasks — including price quoting, insurance sale, and claims settlement — thereby replacing the need for traditional human insurance brokers and actuaries. According to Lemonade, digitalizing insurance underwriting leads to superior assessment and quantification of risk, which in turn leads to improved claims loss ratio.

3.     Given Lemonade's data-driven business model, Lemonade collects millions of data points about its customers. In fact, on its website and in marketing materials, Lemonade touts its ability to extract 1,600 data points about a customer by asking only 13 questions, which Lemonade claims is one hundred times more than what other insurance carriers can do. As the Company's CEO revealed, Lemonade's "one million customers translates into billions of data points, which feed [its] AI at an ever growing speed."[1] Lemonade's COO and co-founder echoed the same sentiment, explaining each time Lemonade earns a new customer, its "system grows smarter" because of the treasure trove of data it collects from each individual. At Lemonade, "[q]uantity generates quality." Lemonade readily admits that it is critically dependent on its ability to collect consumer data, which Lemonade uses to train its AI and create algorithms allowing Lemonade to predict and monetize consumer behavior.

4.     The proliferation of behavioral economics and marketing science have caused a significant expansion in the use of biometric data. Biometric data are unique physical

---

[1] *Lemonade Ends 2020 With Over One Million Active Customers*, Businesswire (Dec. 31, 2020), https://www.businesswire.com/news/home/20201231005145/en/Lemonade-Ends-2020-With-Over-One-Million-Active-Customers.

characteristics such as retina or iris scans, fingerprints, voiceprints, or hand and face geometry scans as well as the information based on or derived from it. One of the most prevalent uses of biometrics is facial recognition technology, which works by scanning an image for human faces, extracting facial feature data from a photograph or image of a human face, generating a "faceprint" from the image through the use of facial-recognition algorithms, and then comparing, or "matching," the resultant faceprint to other faceprints stored in a "faceprint database."

5.       The use of biometric data also raises a host of privacy concerns and risks associated with misuse or theft. Indeed, consumer surveys show that consumers are more sensitive about biometric data than other categories of personal information, with less than 10% of consumers willingly give up their biometrics in exchange for shopping for online products and services in 2018. Well aware of consumers' legitimate and reasonable concerns over their privacy, Lemonade assured, and continues to assure, its customers like Plaintiff and the Class members, that Lemonade will honor their privacy choices and fully disclose the type of information Lemonade collects, why it collects it, and what it does with it. In fact, Lemonade expressly and impliedly assured its customers, like Plaintiff and the Class members, that it **will not** collect, require, sell or share consumers' biometric data in the context of consumers' use of Lemonade's services in its Data Privacy Pledge.[2] The unsuspecting consumers, including Plaintiff and the Class members, fell for these promises in relying on Lemonade's guarantees to their detriment.

6.       On May 24, 2021, consumers learned—from Lemonade's own public admissions— that despite Lemonade's express and implied assurances in its policies and contracts, Lemonade collects, stores, analyzes, or otherwise uses biometric data of thousands of its customers

---

[2] Lemonade's Data Privacy Pledge, LEMONADE, https://www.lemonade.com/privacy-policy (last visited Aug. 18, 2021).

without their authorization or consent. Lemonade extracts consumers' biometric data surreptitiously in the claim submission process by requiring its customers to upload a video of themselves narrating the circumstances of their claims. Lemonade admitted to this practice in a series of since deleted tweets, in which Lemonade revealed that its AI chatbot "analyzes [videos submitted by consumers] for fraud [and that it] can pick up non-verbal cues that traditional insurers can't." Subsequent tweets by Lemonade further confirmed that the Company utilizes facial recognition technology, a form of biometric data, for fraud detection purposes.

7.      To be sure, as Lemonade admitted, its violations are deliberate and calculated to lead to increased revenues for Lemonade. In a tweet posted on the same day, Lemonade revealed that the analysis of customers' videos "ultimately helps us lower our loss ratio (aka, how much we pay out in claims vs. how much we take in), and our overall operating costs." Thus, Lemonade derives sizeable commercial and financial benefit from its undisclosed practice of collecting customers' biometric data. Each such collection is a violation of New York State's statutory and common law.

8.      Millions of insurance policies were sold to U.S. consumers during the Class Period. In only 4.3 years, Lemonade surpassed one million customers in 2020, representing an unprecedented growth in the insurance industry. Plaintiff and Class members would not have purchased Lemonade's insurance, and/or would have paid less for their Lemonade's insurance products and services, if they had known Lemonade surreptitiously collects, stores, analyzes, and uses their biometric data without their knowledge or authorization.

## II.      JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C § 1332(d). Jurisdiction is proper because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, there are

more than 100 putative members of the Class (defined below), and a significant portion of putative Class members are citizens of a state different from at least one Defendant. 28 U.S.C. § 1332(d)(2)(A).

10.     This Court has general personal jurisdiction over Defendants Lemonade, Inc., Lemonade Insurance Company, and Lemonade Insurance Agency, LLC because they are either incorporated or organized under the laws of New York or have their principal place of business in this state.

11.     The Court also has specific personal jurisdiction over all Defendants based on a forum selection clause contained Lemonade's Terms of Service, which states that "any dispute concerning the [Lemonade] app or these Terms shall be subject to the exclusive venue of a court of competent jurisdiction in New York, New York."[3] Alternatively, the Court may exercise specific personal jurisdiction over all Defendants as they purposefully availed themselves of the forum by regularly conducting and/or soliciting substantial business in New York as part of a continuous and systematic effort to exploit the New York market for profit, including by advertising, marketing, and selling insurance products to persons located in this state that incorporated AI technology which, as alleged here in, collected Plaintiff and Class member's biometric information without their consent.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because Lemonade transacts business in this District and a substantial portion of the events giving rise to the claims occurred in this District. Furthermore, Defendants Lemonade Inc., Lemonade Insurance Company, and Lemonade Insurance Agency LLC are incorporated under the laws of New York

---

[3] Terms of Service and Insurance Related Notices, LEMONADE (Aug. 2, 2021), https://www.lemonade.com/terms-of-service (hereinafter "Terms of Service").

and are licensed as insurance agents in New York. Venue is also proper because Lemonade's Terms of Service state that "any dispute concerning the [Lemonade] app or these Terms shall be subject to the exclusive venue of a court of competent jurisdiction in New York, New York."

### III.   PARTIES

#### A.   Plaintiff

13.    Plaintiff is a natural person and citizen of the State of New York and a resident of Queens County.

14.    Plaintiff purchased Lemonade's renters insurance policy on January 25, 2021. In order to purchase the policy, Plaintiff created an account on Lemonade's app and agreed to Lemonade's Terms of Service. Plaintiff's renters insurance policy provided for coverage for lost or stolen jewelry.

15.    On or around May 25, 2021, Plaintiff lost a piece of jewelry worth $3,500. On the same day, Plaintiff filed a claim, via the Lemonade app, for the lost item. In the context of submitting his claim, Plaintiff was connected to one of Lemonade's chatbots called AI Jim, who asked a series of questions regarding the circumstances of Plaintiff's claim, including the date when the incident occurred and the cause of the loss.

16.    After Plaintiff responded to all AI Jim's questions, AI Jim asked Plaintiff to sign a pledge confirming that the information provided is "100% true and accurate."  Following signing of the pledge, AI Jim asked Plaintiff to "record a short video of [Plaintiff] describing the incident."

17.    Plaintiff complied with AI Jim's request and recorded a 47 second long video describing the circumstances of his claim. AI Jim did not immediately approve Plaintiff's claim. Instead, AI Jim passed the claim onto Lemonade's human team. Plaintiff's claim was approved 10 days later on June 4, 2021.

18.    As described herein, Lemonade intentionally collected, stored, analyzed, or

otherwise used Plaintiff's biometric data. The unlawfully collected biometric data contained

personal information, including Plaintiff's face geometry and/or voiceprint, and was collected

without Plaintiff's knowledge or authorization.

19.     The Terms of Service that Plaintiff bargained for and agreed to do not disclose that

Lemonade would collect, store, analyze, of otherwise use Plaintiff's and Class members' biometric

data. Moreover, Lemonade's Data Privacy Pledge contains express promises that Lemonade will

not collect, store, analyze, or otherwise use Plaintiff's biometric data. Lemonade's Data Privacy

Pledge states that it provides "[a] full list of the categories of info [it] collect[s] and do[es not]

collect." Under the heading "Let us be specific. Here's what we may collect" Lemonade provides

a chart that clearly demonstrates that it will not collect, sell, or send on to service providers

biometric information under any circumstances:

### Let us be specific. Here's what we may collect:

| CATEGORY OF PERSONAL INFORMATION | COLLECTED AND REQUIRED TO PROVIDE OUR SERVICES | SOLD TO THIRD PARTY (WE WILL NEVER DO THAT) | WE MAY SEND IT TO ONE OF OUR SERVICE PROVIDERS |
|---|---|---|---|

* * *

| Biometric information (such as voice and handwriting recognition) | ✕ | ✕ | ✕ |

20.     Accordingly, Plaintiff believed that his biometric data would not be analyzed,

collected, stored, and used. Plaintiff did not consent or provide permission for Lemonade to

analyze, collect, store, or use, his biometric data.

21.     Plaintiff was unaware that Lemonade, in direct contravention to the express and

implied promises made in Lemonade's Data Privacy Pledge, collected, stored, analyzed, or used

his biometric data. Had Plaintiff known that Lemonade unlawfully collects, stores, analyzes, or uses his biometric data, Plaintiff would not have purchased an insurance policy from Lemonade or would have paid less for the same insurance policy.

22.     Additionally, based on Lemonade's representations regarding consumers' privacy, including but not limited to its statement that it "values and protects the privacy of [consumers'] information," Plaintiff and the Class members expected that Lemonade would not collect, store, analyze, or use their biometric data absent Plaintiff's and Class members' authorization, knowledge, and/or consent.

23.     As a result of Lemonade's unlawful practices, Plaintiff and Class members were directly harmed by Lemonade's collection, storage, analysis, or use of Plaintiff's biometric data. Plaintiff and Class members were deprived of the benefit which they bargained for and expended sums of money they would not have expended absent Lemonade's promises and guarantees.

**B.     Defendants**

24.     Lemonade Inc. is a Delaware corporation with its principal place of business in the State of New York.

25.     Lemonade Insurance Company is Lemonade's Inc. wholly owned subsidiary and an insurance corporation organized under the laws of New York. According to Lemonade's Annual Report filed on SEC Form 10-K,[4] Lemonade Insurance Company "issues insurance policies and pays claims.

26.     Lemonade Insurance Agency, LLC is Lemonade's Inc. wholly owned subsidiary and a limited liability company licensed as an insurance agent under the laws of New York. According to Lemonade's Annual Report filed on SEC Form 10-K, Lemonade Insurance Agency

[4] Lemonade, Inc., Annual Report (Form 10-K) (Mar. 8, 2021), https://investor.lemonade.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=14783024.

LLC "acts as the distribution and marketing agent for Lemonade Insurance Company and provides certain underwriting and claims services, and receives a fixed percentage of premiums for doing so."

27.     Lemonade Ltd. is the wholly owned subsidiary and a company organized under the laws of Israel of Lemonade Inc. According to Lemonade's Annual Report filed on SEC Form 10-K, Lemonade Ltd. provides "technology, research and development, management, marketing, and other services to the companies in the group." Upon information and belief, Lemonade Ltd. provides the technology, services, and systems used to collect, store, analyze and use users' biometric information.

28.     Lemonade Life Insurance Agency, LLC is Lemonade's wholly owned subsidiary and a limited liability company organized under Delaware law. According to Lemonade's Annual Report filed on SEC Form 10-K, Lemonade Life Insurance Agency, LLC "acts as the distribution and marketing agent for the sale and servicing of life insurance products."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Lemonade's Business Model and Its Use of Artificial Intelligence

29.     Lemonade is an insurance company that offers renters, homeowners, pet, life insurance, and other related insurance policies and claim settlements. Lemonade purports to operate a disruptive business model which leverages artificial intelligence-based technology. Lemonade's provision of insurance-related services and products is conducted digitally with the use of online "chatbots," which are computer programs designed to simulate and process human conversation.

30.     Lemonade claims its AI and chatbots are capable of reducing the need for human insurance brokers and actuaries in order to streamline the insurance claim process. According to Lemonade, its bots can complete a majority of insurance-related tasks, including insurance

underwriting, provision of quotes, payment processing, and claim settlement and resolution. In its marketing materials, including its website and the app, Lemonade touts the speed of its AI in processing and handling customers' insurance claims. The Company claims a "two minute chat with our bot, AI Maya, is all it takes to get covered with renters or homeowners insurance."

31.     Lemonade's bot, Maya, is a virtual assistant capable of tracking developing real-time catastrophes and notifying customer of nearby fires and sever weather events as they develop. Maya is also capable of providing quotes, handling payments, making changes to existing policies, and answering complex questions. Lemonade's Maya collects information, provides quotes and handles payments. Lemonade's other bot, Jim, is a machine learning bot that handles 96% of claims. Lemonade maintains Jim is capable of managing the entire claims process without any human involvement in and that Jim "pays claims in as little as three seconds." In 2019, Jim handled approximately 20,000 claims and paid out $2.5 million with no human involvement. About one-third of all submitted claims are paid automatically within seconds. According to the Company, the digitalization of insurance underwriting by the use of AI bots allows Lemonade to assess and quantify risks more accurately than traditional insurance carriers can.

32.     Lemonade's reliance on the use of AI and bots requires Lemonade to collect troves of data about its customers, which Lemonade uses to create algorithms and to train its AI bots on almost a daily basis. According to Lemonade, by asking only 13 questions in the context of selling insurance coverage, Lemonade derives "1,600 data points" about the customer, which is "100X more data than traditional insurance carriers."[5] As a result, Lemonade's databank contains billions of data points that feed into its AIs, including among other things, information about the customers'

---

[5] Sara Morrison, *A Disturbing, Viral Twitter Thread Reveals How AI Insurance Can Go Wrong*, VOX, (May 27, 2021 1:30 pm), https://www.vox.com/recode/22455140/lemonade-insurance-ai-twitter.

demographics, belongingess to protected classifications, employment history, health insurance information, education, national origin, and medical information.

33.     To submit an insurance claim, Lemonade's customers, like Plaintiff and Class members, are required to sign into Lemonade's app. After a brief conversation with AI Jim, customers are asked to record a short video message describing the circumstances upon which their insurance claim is based. Lemonade claims that the video process is used because it is purportedly "better for [its] customers, making it easier for them to describe what happened in their own words."[6] Lemonade's website shows the following diagram summarizing the claim filing process:



34.     According to Lemonade, the Company extracts thousands of datapoints from the videos. As the Company readily admits, following the submission of a video, AI Jim analyzes the contents of the video by applying "dozens of anti-fraud algorithms" to make the determination whether to approve the claim. Ultimately, AI Jim pays the claim or passes the claim for resolution onto a human claims specialist to request additional documentation and make the final decision whether to approve or deny the claim.

---

[6] Lemonade's Claim Automation, LEMONADE, https://www.lemonade.com/blog/lemonades-claim-automation/ (last visited Aug. 20, 2021).

35.    As alleged in detail below, Lemonade collects, stores, analyzes, or otherwise uses biometric data extracted from the videos its customers submit when making a claim for insurance coverage without their consent. Biometric data comprises of: (i) biometric identifiers, which are individuals' unique physical characteristics, such as retina or iris scans, fingerprints, voiceprints, or hand and face geometry scans; and (ii) biometric data, which is information based on or derived from the biometric identifiers.

**B.    Lemonade Expressly and Impliedly Assured Its Customers That it Will Not Collect, Store, Analyze, or Otherwise Use Their Biometric Data**

36.    To purchase Lemonade's products and services, Plaintiff and Class members are required to create a unique account on Lemonade's app and agree to Lemonade's Terms of Service. Lemonade's Terms of Service expressly incorporate by reference Lemonade's Data Privacy Pledge, which is accessible on Lemonade's website via a hyperlink. Lemonade's Data Privacy Pledge specifically states that it "follows state laws implementing the Gramm-Leach-Bliley's Act (GBLA) notification requirements."

37.    Lemonade's Terms of Service and Data Privacy Pledge expressly and impliedly assured Plaintiff and the Class members that Lemonade would safeguard their personal information. More specifically, Lemonade's Terms of Service claimed that "Lemonade values and protects the privacy of your information." Lemonade's Data Privacy Pledge similarly promises to "always maintain our commitment to protecting your privacy."

38.    As part of Lemonade's efforts to create the impression that Lemonade was transparent with its data collection and use practices, Lemonade affirmed in its Data Privacy Pledge that it discloses the "full list" of data that Lemonade collects and the use thereof. A chart incorporated into the Data Privacy Pledge display various categories of data along with Lemonade's purported disclosures regarding its collection and use. In it, Lemonade expressly

represented that it does **not** collect, require, sell, or share customers' biometric data:

### Let us be specific. Here's what we may collect:

| CATEGORY OF PERSONAL INFORMATION | COLLECTED AND REQUIRED TO PROVIDE OUR SERVICES | SOLD TO THIRD PARTY (WE WILL NEVER DO THAT) | WE MAY SEND IT TO ONE OF OUR SERVICE PROVIDERS |
|---|---|---|---|
| Images, audio and video recordings | ✓ | ✗ | ✓ |
| Bank account number | ✓ Claim payments | ✗ | ✓ Secure payment processing |
| Biometric information (such as voice and handwriting recognition) | ✗ | ✗ | ✗ |
| Characteristics of protected classifications (e.g. age, gender, race, ethnicity, physical or mental handicap, etc.) | ✓ Age, gender | ✗ | ✓ Analytics providers |
| Commercial information (e.g. products or services purchased, or other purchasing or consuming histories or tendencies) | ✗ | ✗ | ✗ |

39. Other representations in Lemonade's Terms of Service and Data Privacy Pledge likewise confirm Lemonade's commitment in not collecting individuals' biometric data. For example, in the context of describing Lemonade's fraud detection efforts, Lemonade merely discloses that it "may collect past property or personal insurance history, as well as things like criminal background information." Similarly, in discussing the claims filing process, Lemonade's Data Privacy Pledge states "[t]o pay claims we require bank account details, as well as personally verifiable info such as the claimant's social security number."

40. To bolster its claims regarding customers' privacy, Lemonade's Data Privacy

Pledge confirmed that Lemonade "follows state laws implementing the Gramm-Leach-Bliley Act's (GLBA) notification requirements." That sentence contains a link to GLBA fact-sheet, which provides a list of the "types of personal information [Lemonade] collect[s]."[7] The list includes the following three items:

- Social Security number, credit history, credit scores and income information.

- Information submitted as a part of a claim and claim history.

- Information submitted when applying for a policy, such as name and contact information.

41.     Based on the foregoing and other express and implied representations and omissions, Plaintiff and the Class members did not know or expect that their biometric data, including among other things, face geometry, voiceprints, or gestures, would be collected, stored, analyzed or otherwise used for the purpose of assessing their claim submission, improving Lemonade's algorithms, fraud detection, or any other purpose not disclosed in Lemonade's Terms of Service and its Data Privacy Pledge.

**C.     Lemonade Collects, Stores, Analyzes, or Otherwise Uses Individuals' Biometric Data**

42.     Contrary to its representations, Lemonade collects, stores, and uses customers' biometric data, including users' non-verbal cues and face geometry, which Lemonade analyzes for purposes of assessing customers' claims and detecting fraud in connection with customers' claims submission. Lemonade customers learned the real truth about Lemonade's practices of collecting their biometric data on May 24, 2021, when Lemonade publicly admitted in a series of since deleted tweets that Lemonade analyzes "non-verbal cues" from the videos submitted as part of

---

[7] *What Does Lemonade Insurance Company ("Lemonade") Do With Your Personal Information?* LEMONADE, https://policies-samples.lemonade.com/privacy-pledge/glba.pdf.

customers' claim submission. According to another tweet (which is displayed below), Lemonade's AI chatbots "carefully analyze[]" customers' videos in determining whether to approve or decline consumers' insurance claims:



43.    In a subsequent tweet, Lemonade added that its practice of determining whether to approve claims based on AI's assessment of consumer videos contributes to Lemonade's bottom line, stating that "[the practice] ultimately helps us lower our loss ratios (aka how much we pay out in claims vs. how much we take in), and our overall operating costs."



44. Lemonade's tweets sparked outrage among consumers and privacy experts who criticized Lemonade's practice of using AI to determine fraud and to boost the company's financial results. Lemonade attempted to blunt the impact of its controversial tweets, explaining that the "term non-verbal cues was a bad choice of words to describe the ***facial recognition technology*** [Lemonade's] using to flag claims submitted by the same person under different identities."[8] See below:

> **TL;DR: We do not use, and we're not trying to build, AI that uses physical or personal features to deny claims.**
>
> There was a sizable discussion on Twitter around a poorly worded tweet of ours (mostly the term 'non-verbal cues,') which led to confusion as to how we use customer videos to process claims. There were also questions about whether we use approaches like emotion recognition (we don't), and whether AI is used to automatically decline claims (never!).
>
> The term non-verbal cues was a bad choice of words to describe the facial recognition technology we're using to flag claims submitted by the same person under different identities. These flagged claims then get reviewed by our human investigators.

---

[8] Lemonade's Claim Automation, LEMONADE, https://www.lemonade.com/blog/lemonades-claim-automation/ (last visited Aug. 20, 2021).

45.     Lemonade thus confirmed that it uses facial recognition technology, which is based on customers' biometric data, such as face geometry. Facial recognition systems use biometrics to map facial features from a photograph or video and then cross-reference it with a database of other faces.

46.     In the aftermath of Lemonade's tweets, Lemonade's spokesperson told media that Lemonade's use of facial recognition was "described accurately"[9] in an older blog posted on Lemonade's website by its President, Shai Wininger, titled *The Sixth Sense: Lemonade's 2019 Product in Review: Blond wigs, weird bots, and ad fails*.[10] Rather than dispelling the admission that Lemonade collects, stores, analyzes or otherwise uses individuals' biometric data, the blog confirmed the opposite was true. According to the blog, Lemonade employs facial recognition technology, which is based on individuals' biometric data, including, at the minimum, the individuals' face geometry. In the blog, Shai Wininger showcased the capabilities of AI Jim, who detected an attempted submission of a fraudulent claim during the summer of 2017. In the blog, Shai Wininger explained an individual—who previously made a successful claim for a stolen camera—created a fake account and recorded a video wearing a necklace, a blond wig, and lipstick. AI Jim "flagged" the individual as potentially fraudulent. During the third attempt by the same individual who was wearing a pink dress, AI Jim once again detected fraud and escalated the case to Lemonade's special investigations unit.

---

[9] Jonathan Vanian, *Insurance Firm Lemonade Backtracks On Claims It Uses A.I. To Scan Customer Faces For Hints Of Fraud*, FORTUNE (May 26, 2021), https://fortune.com/2021/05/26/lemonade-insurance-ai-face-scanning-fraud/.

[10] Shai Wininger, *The Sixth Sense: Lemonade's 2019 Product in Review: Blond wigs, weird bots, and ad fails*, LEMONADE, https://www.lemonade.com/blog/the-sixth-sense/ (last visited Aug. 20, 2021).

**D.    Lemonade's Practice of Collecting, Storing, Analyzing, and Using Individuals' Biometric Data Personally Harmed Plaintiff**

47.    Biometric data is one of the most sensitive forms of personal information because biometric data cannot be changed if stolen or compromised. Once a person's unique and permanent biometric identifiers are exposed, the victim is left with no recourse to prevent identity theft and/or unauthorized tracking. Accordingly—as confirmed by consumer studies and surveys—the vast majority of Americans do not feel comfortable giving up their biometric data to organizations for the fear of identity theft. For example, the largest-ever-conducted study on the subject matter by the University of Texas titled *Consumer Attitudes About Biometric Authentication*,[11] showed that 86% of consumers were concerned about the misuse of their personal information and fewer than 10% of consumers felt comfortable giving up their biometrics for online shopping, internet games, or accessing online school records. That same study revealed "invasion of personal privacy" is the chief reason for consumers' discomfort in sharing their biometric data. Similarly, a recent survey of 1,000 individuals published by digital identity firm Entrust titled *State of Consumer Data Privacy Survey*,[12] found 79% of respondents were concerned about their privacy, a fear mainly driven by the risks of attacks and security breaches.

48.    Based on consumers' preferences and concerns over personal data as well as Lemonade's express and implied promises that it will not collect Plaintiff and Class members' biometric data, Plaintiff and Class members have an expectation that their face geometry, voiceprints, or other biometric data will not be collected, analyzed, stored, or otherwise used by Lemonade without their knowledge and/or consent. Violation of the expectation, which Plaintiff

---

[11]    Rachel L. German, et al., *Consumer Attitudes About Biometric Authentication* (May 2018), https://identity.utexas.edu/sites/default/files/2020-09/Consumer%20Attitudes%20About%20Biometrics.pdf.

[12]    Alessandro Mascellino, *Consumers' Contrasting Opinions Towards Biometric Adoption Shown By Entrust Report* (Feb 1, 2021), https://www.biometricupdate.com/202102/consumers-contrasting-opinions-towards-biometric-adoption-shown-by-entrust-report.

and Class members bargained for, directly harmed Plaintiff and Class members. Lemonade purported to act consistently with consumer expectations and its written guarantees by promising to only collect certain types of data, none of which includes biometric data.

49.     Despite these promises, Lemonade misrepresented its data collection policies and failed to disclose that it collects biometric data in complete disregard for users' privacy, the law, and the contractual promises Lemonade has made to Plaintiff and Class members. Plaintiff and Class members would not have paid for Lemonade insurance, or would have paid less, had they known that Lemonade collects, stores, analyzes, and uses their biometric data.

50.     At no point did Plaintiff or Class members consent to or authorize Lemonade to collect, store, analyze, or use their biometric data that was obtained from their claim submission videos. Lemonade does not disclose that it collects, stores, analyzes, or uses biometric data submitted to it as part of individuals' submission of video. Plaintiff relied on Lemonade's express and implied promises that it would not collect, store, analyze, or use individuals' biometric data and submitted their videos as part of the claims submission process, which they would not have done had they known that the biometric data contained in the videos was being collected, stored, analyzed, and used by Lemonade.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

51.     The applicable statutes of limitation have been tolled as a result of Lemonade's knowing and active concealment and denial of the facts alleged herein, namely their practice of collecting, analyzing, and using Plaintiff's and Class members' biometric data without disclosure or consent.

52.     As alleged in detail herein, Lemonade expressly and impliedly assured consumers that it will not collect, store, analyze, or otherwise use individuals' biometric data for any purposes. Lemonade Terms of Service and Data Privacy Pledge likewise deny any collection and use of

individuals' biometric data. Lemonade misrepresented and concealed the nature and extent of their actions and intentions.

53.     Furthermore, Plaintiff and the Class members also have a reasonable expectation that their biometric data will not be collected, shared, analyzed, or otherwise used in the context of receiving services from Lemonade. This expectation is based on Lemonade's representations in its Terms of Service, Data Privacy Pledge, its website, other marketing materials, and consumer preferences and concerns over personal information.

54.     Plaintiff and Class members could not, with due diligence, have discovered the full scope of Lemonade's conduct, due in no small part to Lemonade's deliberate efforts to conceal such conduct. All applicable statutes of limitation also have been tolled by operation of the discovery rule and Lemonade's fraudulent concealment.

55.     Lemonade was under a duty to disclose the nature and significance of its data collection, including specifically their collection, storage, and use of biometric data amongst other highly sensitive data, but did not do so. Lemonade is therefore estopped from relying on any statute of limitations.

## VI.   CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this case as a Class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) on behalf of themselves and the following Class:

> All individuals whose biometric data was collected, captured, stored, used, transmitted, received or otherwise obtained and/or disseminated by Lemonade (the "Class").

57.     Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and

file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

58.     Certification of Plaintiff's claims for Class-wide treatment are appropriate because all elements of Fed. R. Civ. P. 23(a) and (b)(2)-(3) are satisfied. Plaintiff can prove the elements of his claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

59.     **Numerosity:** The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiff is informed and believes that there are likely hundreds of thousands of members of the Class, the precise number of Class members is unknown to Plaintiff. Class members may be identified through objective means, including Lemonade's own records. Class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

60.     **Commonality and Predominance:** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.     Whether Defendants collected, stored, analyze, or otherwise used Plaintiff's and the Class members' biometric data;

b.     Whether Defendants properly informed Plaintiff and the Class that they collected, stored, analyzed or otherwise used, their biometric data;

c.     Whether Defendants obtained consent from Plaintiff and the Class to collect, store, analyze or otherwise use their highly sensitive data, including biometric identifiers;

d.     Whether Defendants adhered to applicable law governing the collection, retention, and use of biometric data;

21

e.   Whether Defendants violated New York GBL § 349 in connection with their practice of collecting, storing, analyzing, or otherwise using Plaintiff's and Class members' biometric data;

f.   Whether Defendants' collection, storage, analysis, or use of Plaintiff's and Class members' biometric data constitutes breach of express and implied contract between Defendants and the Plaintiff and Class members;

g.   Whether Plaintiff and the Class members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement; and,

h.   Whether Plaintiff and the Class members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

61.   **Typicality:** Plaintiff's claims are typical of the claims of all Class members because, like other Class members, Plaintiff was harmed by Lemonade's unlawful collection, storage, analysis, and use of their biometric data.

62.   **Adequacy of Representation:** Plaintiff is an adequate Class representative because he is a member of the Class and his interests do not conflict with the interests of other Class members that they seek to represent. Plaintiff is committed to pursuing this matter for the Class with the Class's collective best interest in mind. Plaintiff has retained counsel competent and experienced in complex class action litigation of this type and Plaintiff intends to prosecute this action vigorously. Plaintiff, and his counsel, will fairly and adequately protect the Class's interests.

63.   **Predominance and Superiority:** As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in Plaintiff's case will also resolve them for the Class's claims. In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendants'

wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

64.     Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## VII.   NEW YORK LAW APPLIES TO THE CLASS

65.     New York's substantive laws apply to every member of the Nationwide Class, regardless of where in the United States the Class Member resides. Defendants' Terms of Service states: "These Terms and your use of the Site are governed in all respects by the laws of the State of New York, without giving effect to any principles of conflicts of laws."

66.     By choosing New York law for the resolution of disputes in the agreement, Lemonade conceded that it is appropriate for this Court to apply New York law to the instant dispute.

67.     Further, New York's substantive laws may be constitutionally applied to the claims of Plaintiff and the Class under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. New York has significant contacts, or a significant aggregation of contacts, to the claims asserted by Plaintiff and all Class members, thereby creating state interest that ensures that the choice of New York state law is not arbitrary or unfair.

68.     Defendants' U.S. headquarters and principal place of business is located in New York. Defendants also own property and conduct substantial business in New York, and therefore

23

New York has an interest in regulating Defendants' conduct under its laws. Defendants' decision to reside in New York and avail itself of New York's laws, and to engage in the challenged conduct from and emanating out of New York, renders the application of New York law to the claims herein constitutionally permissible.

69.     New York is also the state from which Defendants' alleged misconduct emanated. This conduct similarly injured and affected Plaintiff and all other Class members.

70.     The application of New York laws to the Class is also appropriate under New York's choice of law rules because New York has significant contacts to the claims of Plaintiff and the proposed Class, and New York has a greater interest in applying its laws here than any other interested state.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of New York's Uniform Deceptive Trade Practices Act**
**(Gen. Bus. Law § 349, *et seq.*)**

71.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

72.     GBL § 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." GBL § 349(a).

73.     As consumers of Lemonade's insurance services, Plaintiff and Class members are "person[s]" within the meaning of GBL § 349.

74.     Plaintiff is authorized to bring a private action under New York's Uniform Deceptive Trade Practices Act, Gen. Bus. Law § 349(h).

75.     Defendants conducted business, trade or commerce in New York State.

76.     Plaintiff and Class members uploaded videos in connection with transactions in "business" "trade" or "commerce" within the meaning of GBL § 349.

77.     This Count is brought for Defendants' deceptive conduct, including their unlawful and deceptive acts related to Defendants' collection, storage, analysis, and use of Plaintiff's and Class members' biometric information, as alleged herein.

78.     Defendants engaged in unlawful and deceptive acts and practices in the conduct of trade or commerce and furnishing of services purchased by Plaintiff and the Class in violation of GBL § 349, including but not limited to the following:

        a.      Defendants failed to disclose that it employed facial recognition technology in connection with processing customers' insurance claims;

        b.      Defendants omitted, suppressed, and concealed that it collected, stored, analyzed, and used customers' highly sensitive data, including biometric data;

        c.      Defendants omitted, suppressed, and concealed that it collected, stored, analyzed, or used users' highly sensitive data, including biometric data;

        d.      Defendants engaged in in deceptive, unfair, and unlawful acts by publicly denying its collection, storage, analysis, and use of customers' biometric data; and

        e.      Defendants held itself out as disclosing all the data and manner in which it collects, uses, or sells users' data, but failed to disclose that it uses facial recognition technology and analyzed, collected, stored, and otherwise used users' highly sensitive data, including biometric identifiers.

79.     Defendants systematically engaged in these deceptive, misleading, and unlawful acts and practices to the detriment of Plaintiff and Class members.

80.     Defendants willfully engaged in such acts and practices and knew or acted in reckless disregard for whether they violated GBL § 349.

81.     Defendants' representations and omissions were material because Lemonade

customers, including Plaintiff, would not have used Lemonade's services had they known that Lemonade would collect, store, analyze, and use their highly sensitive data, including biometric data, without their knowledge or consent.

82. Plaintiff and Class members relied on Defendants' deceptive representations when they paid money in exchange for Lemonade's products and services in connection with their Lemonade insurance policies.

83. Plaintiff and Class members had no way of knowing Defendants secretly collected, stored, analyzed, and used their highly sensitive data, including biometric data.

84. The above unfair and deceptive acts and practices by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

85. Plaintiff and Class members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50, whichever is greater, treble damages, injunctive relief, and attorneys' fees and costs.

<strong><u>SECOND CLAIM FOR RELIEF</u><br>Breach of Contract<br>(Under New York Law)</strong>

86. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

87. Plaintiff and Class members executed a valid and enforceable contract with Lemonade by agreeing to Lemonade's Terms of Service (the "Agreement").

88. Defendants expressly agreed to: (a) not collect, store, analyze, or otherwise use Plaintiff's and Class members' biometric data; and (b) adhere to the law when collecting, storing,

analyzing, or otherwise using Plaintiff's and Class members' biometric data. Defendants agreed to the foregoing in return for valuable consideration in the form of insurance premium payments and in providing their biometric data and subjecting themselves to Defendants' claim submission procedures.

89.     Plaintiff and Class members paid for the provision of insurance coverage and subjected themselves to Defendants' claim submission procedures by recording and uploading a video of themselves to Lemonade's app. Accordingly, Plaintiff and Class members performed all requisite promises and/or acts under the Agreement with Defendants.

90.     Lemonade breached the Agreement, without limitation by: (a) collecting, storing, analyzing, and otherwise using Plaintiff's and Class members' biometric data; and (b) failing to adhere to the applicable laws when collecting, storing, analyzing, and otherwise using Plaintiff's and Class members' biometric data.

91.     Plaintiff and Class members have been damaged by Lemonade's breach of the Agreement.

92.     As a direct and proximate result of Defendants' breach, Plaintiff and Class members have sustained damages in an amount to be determined at trial, plus interest.

<u>**THIRD CLAIM FOR RELIEF**</u>
**Breach of Implied Contract**
**(Under New York Law)**

93.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

94.     Defendants solicited and invited prospective customers such as Plaintiff and Class members to pay premiums and to provide their biometric data to Lemonade as part of the claim submission process. Plaintiff and Class members accepted Defendants' offer and paid premiums

and provided their biometric data to Lemonade.

95.     When Plaintiff and Class members subscribed to receive Lemonade's services and products in the form of insurance coverage, they paid money and provided their biometric data to Lemonade, and have thereby entered in an implied contract with Defendants pursuant to which Defendants agreed to safeguard and protect the information provided to them and to adhere to the existing laws in the collection, storage, analysis, and use of their information.

96.     In entering into such implied contract, Plaintiff and Class members reasonably believed that Defendants would safeguard and protect the information provided to them and to adhere to the existing laws in the collection, storage, analysis, and use of their information.

97.     Plaintiff and Class members would not have paid for or would have paid less for insurance coverage and would have not provided their biometric data to Lemonade in the absence of the implied contract between them and Defendants.

98.     Plaintiff and Class members paid for the provision of insurance coverage and subjected themselves to Defendants' claim submission procedures by recording and uploading a video of themselves on Lemonade's app. Accordingly, Plaintiff and Class members performed all requisite promises and/or acts under the implied contract.

99.     Lemonade breached the implied contract by: (a) collecting, storing, analyzing, and otherwise using Plaintiff's and Class members' biometric data; and (b) failing to adhere to the applicable laws when collecting, storing, analyzing, and otherwise using Plaintiff's and Class members' biometric data.

100.    As a direct and proximate result of Defendants' breach of the implied contract, Plaintiff and Class members have sustained damages in an amount to be determined at trial, plus interest.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Under New York Law)**

101.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

102.    Absent Defendants' unauthorized collection, storage, analysis, and use of Lemonade's customers' personal information, including biometric information, Defendants would have had to pay Plaintiff and each member of the Class monetary compensation in exchange for their valuable personal information and consumer habits. As such, Plaintiff and other members of the Class conferred an improper benefit upon Defendants, which Defendants were aware of and have unjustly retained.

103.    As a direct and proximate result of Defendants' unjust enrichment, under principles of equity and good conscience, Plaintiff and the Class are entitled to full disgorgement and restitution of all amounts by which Defendants were enriched through their unlawful or wrongful conduct.

**FIFTH CLAIM FOR RELIEF**
**Declaratory and Injunctive Relief**
**(Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq.*)**

104.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

105.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the statutes described in this Complaint.

106.    An actual controversy has arisen regarding the lawfulness of Defendants'

collection, storage and use of Plaintiff's and Class members' highly sensitive data, including biometric identifiers without their authorization or knowledge. Plaintiff alleges that Defendants' actions violate Defendants' statutory duties.

107.    Plaintiff and Class members continue to suffer injury as a result of the unauthorized collection, storage and use of their highly sensitive data, including biometric identifiers, and remain at imminent risk that further unauthorized collection, storage or use of their biometric data will occur in the future.

108.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Defendants must either cease and desist from collecting, storing, or using biometric data from Lemonade insurance customers, or obtain consent from users and disclose such practices in its Terms of Service and/or Data Privacy Pledge.

109.    The Court also should issue corresponding prospective injunctive relief requiring Defendants to immediately destroy, and cease from using, any biometric data collected without Plaintiff's and Class members' authorization or knowledge.

110.     If an injunction is not issued, Plaintiff and Class members will suffer irreparable injury, for which they lack an adequate legal remedy. Their sensitive and immutable biometric data is already in the possession of Defendants without their consent. If Defendants continues to store and use that data, or collect further biometric data, Plaintiff and Class members will not have an adequate remedy at law, because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

111.    The hardship to Plaintiff and Class members if an injunction does not issue greatly exceeds the hardship to Defendants if an injunction is issued. The unauthorized collection, storage and use of their biometric data constitutes a breach of the contractual promises between Plaintiff

and Class members on the one hand, and the Defendants, on the other hand. It also constitutes a major intrusion on Plaintiff's and Class' members reasonable expectation of privacy, especially because this information is collected without their consent. On the other hand, the cost to Defendants in complying with an injunction by disclosing their intended use of users' biometric data is relatively minimal.

112.   Issuance of the requested injunction will serve the public interest by preventing further unauthorized collection, storage and use of biometric data, thus eliminating the additional injuries that would result to Plaintiff and the hundreds of thousands of consumers whose confidential information would be further compromised.

## VIII.   RELIEF REQUESTED

WHEREFORE, Plaintiff on behalf of himself and the proposed Class, respectfully request that the Court enter an Order:

A.   Certifying this case as a Class action on behalf of the Class defined above, appointing Plaintiff as representatives of the Class, and appointing their counsel as Class Counsel;

B.   Declaring that Defendants' actions, as set out above, violate New York Gen. Bus. Law § 349 cited herein;

C.   Declaring that Defendants' actions, as set out above, constitute a breach of express and implied contract;

D.   Awarding injunctive relief, including among other things, an order requiring Lemonade to delete all video recordings of the members of the Class, and cease further collection, storage, analysis, and use of individuals' biometric data without their consent and/or authorization;

E.   Requiring Lemonade to undertake measures to cure the harm caused to the Class by its wrongdoing, as alleged herein, including, but not limited to improving its privacy disclosures

and obtaining adequate informed consent for the collection, storage, analysis, and use of consumers' biometric data;

F.      Awarding Plaintiff and the Class compensatory, consequential, statutory, nominal, and restitution where applicable in the amount to be determined at trial;

G.      Awarding attorneys' fees, costs, and expenses, as provided by law or equity;

H.      Awarding pre-judgment and post-judgment interest, as provided by law or equity;

I.      Awarding such other further injunctive and declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

J.      Awarding such other and further relief as the Court deems reasonable and just.

## IX.      DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.


Dated: August 20, 2021                      */s/ Christian Levis*
                                            Christian Levis
                                            Andrea Farah
                                            Amanda Fiorilla
                                            **LOWEY DANNENBERG, P.C.**
                                            44 South Broadway, Suite 1100
                                            White Plains, NY 10601
                                            Telephone:      (914) 997-0500
                                            Facsimile:      (914) 997-0035
                                            Email: clevis@lowey.com
                                                    afarah@lowey.com
                                                    afiorilla@lowey.com

                                            *Attorneys for Plaintiff and the Proposed Class*